Michael C. Spencer
  mspencer@milberg.com
Janine L. Pollack
  jpollack@milberg.com
**MILBERG LLP**
One Pennsylvania Plaza
New York NY 10119
Telephone: (212) 594-5300
Facsimile: (212) 868-1229

Lee A. Weiss
  lweiss@bwgfirm.com
**BROWNE WOODS GEORGE LLP**
49 West 37th Street, 15th Floor
New York, NY 10018
Telephone: (212) 354-4901
Facsimile: (212) 354-4904

(Additional Counsel on Signature Page)

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF NEW YORK

JUDGE SCHEINDLIN

**09 CIV 10589**

|  |  |
|---|---|
| BRADLEY C. SMITH, derivatively on behalf of BLACKROCK LARGE CAP SERIES FUNDS, INC., | ) ) ) |
| Plaintiff, | ) ) Civil Action No. |
| vs. | ) |
| BLACKROCK INVESTMENTS, LLC, FAM DISTRIBUTORS, INC., BLACKROCK DISTRIBUTORS, INC., DAVID O. BEIM, RONALD W. FORBES, MATINA S. HORNER, RODNEY D. JOHNSON, HERBERT I. LONDON, CYNTHIA A. MONTGOMERY, JOSEPH P. PLATT, JR., ROBERT C. ROBB, JR., TOBY ROSENBLATT, KENNETH L. URISH, FREDERICK W. WINTER, RICHARD S. DAVIS, AND HENRY GABBAY, | ) ) ) ) ) ) **VERIFIED DERIVATIVE COMPLAINT** ) ) DEMAND FOR JURY TRIAL ) ) ) |
| Defendants, | ) ) |
| and | ) ) |
| BLACKROCK LARGE CAP SERIES FUNDS, INC., | ) ) |
| Nominal Defendant. | ) ) |



RECEIVED
DEC 30 2009
U.S.D.C. S.D.N.Y.
CASHIERS

## VERIFIED DERIVATIVE COMPLAINT

1.      Plaintiff, through his attorneys, derivatively on behalf of BlackRock Large Cap Series Funds, Inc. ("the Corporation"), makes the following allegations for his complaint.  The allegations are based upon personal knowledge as to plaintiff and his own acts, and as to other matters, upon information and belief based upon an investigation conducted by his attorneys, which included a review of the Corporation's regulatory filings.

## NATURE OF THE ACTION

2.      The Corporation, nominal defendant herein, is a series of mutual funds.  This is a derivative lawsuit brought on behalf of the Corporation alleging wrongdoing by defendants, who are directors of the Corporation and the principal distributor/underwriter of shares of the Corporation's mutual funds.  Plaintiff is a holder of shares in a mutual fund that is part of the Corporation.

3.      Plaintiff's claims are based on defendants' continued provision and approval of payments from Corporation assets of "asset-based compensation" to broker-dealer firms that hold Corporation mutual fund shares in brokerage accounts, contrary to the Investment Advisers Act of 1940 ("Advisers Act"), the Investment Company Act of 1940 ("ICA"), and *Financial Planning Association v. SEC*, 482 F.3d 481 (D.C. Cir. 2007).  Defendants' ongoing provision and approval of these payments, in violation of law, is unlawfully depleting the assets of the Corporation.

4.      Under the federal securities laws, broker-dealers may only receive compensation from transactional commissions (based on the purchase or sale of securities), and may not lawfully receive asset-based compensation (ongoing payments calculated as a percentage of the average daily net value of assets held in customer accounts, hereinafter referred to as "Asset-Based Compensation") unless the broker-dealer is providing an "advisory account" in which to

hold the shares – *i.e.*, an account that is governed by and subject to the investor protections and benefits of the Advisers Act. Accounts at broker-dealer firms that are not subject to the Advisers Act are commonly referred to as "brokerage accounts."

5.     In violation of those laws, the Corporation and its distributor/underwriter are paying Asset-Based Compensation to broker-dealers with respect to mutual fund shares held in brokerage accounts rather than advisory accounts.  In the plaintiff's case, the Corporation and its distributor/underwriter are paying Asset-Based Compensation to Merrill Lynch, Pierce, Fenner & Smith Incorporated, which holds plaintiff's shares of the Corporation in a brokerage account. These payments are financed from daily deductions from the Corporation's assets.

6.     This action seeks declaratory and injunctive relief to cease the unlawful payments of Asset-Based Compensation on shares held in brokerage accounts; restitution to the Corporation from the distributor/underwriter of past unlawful payments; and damages from the Directors resulting from the breaches of the fiduciary duties of loyalty and due care and their wasting of Corporation assets.

## JURISDICTION AND VENUE

7.     This Court has federal question subject matter jurisdiction over all claims asserted herein pursuant to 15 U.S.C. § 80a-43, and 28 U.S.C. § 1331 and § 1337, because each claim involves issues arising under the ICA, and the rules and regulations thereunder, and this Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a).  This action is not a collusive one to confer jurisdiction that the Court would otherwise lack.

8.     This Court has personal jurisdiction over each of the defendants because the Corporation's principal place of business is located within this District and all of the defendants have conducted business in this District, including business relating to the claims herein being asserted on behalf of the Corporation.

9.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) and 15 U.S.C. § 80a-43 because the Corporation maintains its headquarters within this District and because many of the acts complained of herein occurred in this District.

## THE PARTIES

10.      Plaintiff Bradley C. Smith is a resident of North Carolina.  Plaintiff owns Class C shares of the BlackRock Large Cap Value Fund, a Corporation, and is therefore a shareholder in the Corporation.  Plaintiff has been a shareholder in the Corporation at all times relevant to this Action.  Plaintiff's shares are held in a brokerage account at Merrill Lynch.

11.      Nominal defendant, the Corporation, is a Maryland corporation.  The Corporation maintains its principal place of business at 40 East 52nd Street, New York, NY 10022.  The Corporation is classified under the ICA as an open-end management investment company of the series type, and is comprised of seven series, or portfolios, commonly known as mutual funds -- BlackRock Large Cap Growth Fund, BlackRock Large Cap Value Fund, BlackRock Large Cap Core Fund, BlackRock Large Cap Growth Retirement Portfolio, BlackRock Large Cap Value Retirement Portfolio, BlackRock Large Cap Core Retirement Portfolio and BlackRock Large Cap Core Plus Fund (the "Funds").  As of March 31, 2009, the Corporation held net assets of $5.27 billion.

12.      Defendant David O. Beim is a current director of the Corporation.  He has served since 2007, and has been classified by the Corporation as an independent board member for purposes of the ICA.

13.      Defendant Ronald W. Forbes is a current director of the Corporation.  He has served since 2007, and has been classified by the Corporation as an independent board member for purposes of the ICA.

14.     Defendant Dr. Matina S. Horner is a current director of the Corporation. She has served since 2007, and has been classified by the Corporation as an independent board member for purposes of the ICA.

15.     Defendant Rodney D. Johnson is a current director of the Corporation. He has served since 2007, and has been classified by the Corporation as an independent board member for purposes of the ICA.

16.     Defendant Herbert I. London is a current director of the Corporation. He has served since 1999, and has been classified by the Corporation as an independent board member for purposes of the ICA.

17.     Defendant Cynthia A. Montgomery is a current director of the Corporation. She has served since 2007, and has been classified by the Corporation as an independent board member for purposes of the ICA.

18.     Defendant Joseph P. Platt, Jr. is a current director of the Corporation. He has served since 2007, and has been classified by the Corporation as an independent board member for purposes of the ICA.

19.     Defendant Robert C. Robb, Jr. is a current director of the Corporation. He has served since 2007, and has been classified by the Corporation as an independent board member for purposes of the ICA.

20.     Defendant Toby Rosenblatt is a current director of the Corporation. He has served since 2007, and has been classified by the Corporation as an independent board member for purposes of the ICA.

21.     Defendant Kenneth L. Urish is a current director of the Corporation.  He has served since 2007, and has been classified by the Corporation as an independent board member for purposes of the ICA.

22.     Defendant Frederick W. Winter is a current director of the Corporation.  He has served since 2007, and has been classified by the Corporation as an independent board member for purposes of the ICA.

23.     Defendant Richard S. Davis is a current director of the Corporation.  He has served since 2007, and has been classified by the Corporation as an interested board member for purposes of the ICA.

24.     Defendant Henry Gabbay is a current director of the Corporation.  He has served since 2007, and has been classified by the Corporation as an interested board member for purposes of the ICA. The defendants referenced in ¶¶ 12-24 are referred to collectively herein as the "Director Defendants."

25.     Defendant BlackRock Investments, LLC ("Distributor") is a Delaware corporation with its principal place of business at 40 East 52nd Street, New York, NY 10022. Distributor is a wholly-owned subsidiary of BlackRock, Inc..  BlackRock, Inc. is a publicly traded company (NYSE: BLK).  The Bank of America Corporation and Merrill Lynch & Co., Inc. own 47.4% of the capital stock of BlackRock, Inc. and 4.9% of its voting common stock. The PNC Financial Services Group, Inc. owns 31.5% of the capital stock, and 46.5% of the voting common stock, of BlackRock, Inc.  Effective October 1, 2008, Distributor has acted as the principal underwriter/distributor for shares in the Corporation.   Prior to that date, FAM Distributors, Inc. ("FAMD") and BlackRock Distributors, Inc. ("BDI") were co-distributors. Distributor is a broker-dealer member of the Financial Industry Regulatory Authority (FINRA),

formerly known as NASD.   Pursuant to a distribution agreement with the Corporation, Distributor enters into selling agreements with retail broker-dealers, who act in an agency capacity for Distributor in the distribution of shares of the Corporation to members of the public.

26.    Defendants FAMD and BDI are Delaware corporations that, upon information and belief, have been dissolved, but are still within the time period under which they must continue as corporate bodies for the purpose of defending lawsuits, as required by 8 Del. Code Ann. § 278.  When active, FAMD and BDI were broker-dealer members of FINRA. Pursuant to a distribution agreement with the Corporation, FAMD and BDI entered into selling agreements with retail broker-dealers, who acted in an agency capacity for Distributor in the distribution of shares of the Corporation to members of the public.

## DEFENDANTS' DUTIES

27.    Pursuant to the ICA, and SEC Rule 38a-1 promulgated thereunder, the directors of a mutual fund series have ultimate responsibility to ensure compliance with the federal securities laws by service providers acting on behalf of the mutual funds, such as the funds' distributor and investment manager.  *See* 17 C.F.R. § 270.38a-1.  The Advisers Act is one of the federal securities laws that the Directors are required to enforce.

28.    The Advisers Act mandates certain disclosure, liability, record keeping and conflict management requirements to protect the clients of professional investment advisers. Unless a statutory exclusion applies, the Advisers Act will govern any customer account at a retail broker-dealer firm, because those firms come under the statute's coverage by making securities recommendations, conducting suitability reviews, and otherwise providing investment advice to their customers.

29.    Under what is known as the "Broker-Dealer Exclusion," a brokerage account at a broker-dealer may avoid the requirements of the Advisers Act if the broker-dealer's

compensation is limited to transactional commissions on the purchase or sale of securities, and if investment advice to the customer is merely "incidental" to providing brokerage services. *See* 15 U.S.C. § 80b-2(11)(C). Brokerage accounts are governed by the Securities Exchange Act of 1934 and the self-regulatory regime mandated therein, including the rules of conduct promulgated by the broker-dealer industry's self-regulatory organization, FINRA. If the Broker-Dealer Exclusion does not apply, and no other exclusion applies, the broker-dealer must establish what is commonly referred to as an "advisory account" for the customer (as opposed to a "brokerage account"), *i.e.* an account governed by the Advisers Act.

30. Another statutory exclusion from the Advisers Act allows the Securities and Exchange Commission (SEC) to designate other persons by regulation to be excluded from the Advisers Act (hereinafter referred to as the "SEC Designates Exclusion"). *See* 15 U.S.C. § 80b-2(11)(F).

31. For most of the last two decades, leading up to the 2007 court ruling in *Financial Planning Association v. SEC*, the SEC encouraged broker-dealers to shift to Asset-Based Compensation in order to reduce churning and other sales abuses tied to transactional commissions. Asset-Based Compensation, *i.e.* ongoing monthly or quarterly payments based on a percentage of the average daily net asset value of the shares held in the account, is not a form of transactional commission, and therefore Asset-Based Compensation may not be paid on accounts that seek to qualify for the Broker-Dealer Exclusion.

32. In order to promote the shift to Asset-Based Compensation, the SEC enacted a new Rule under the Advisers Act, under what the agency believed to be its statutory authority under the SEC Designates Exclusion. The new rule, SEC Rule 202(a)(11)-1, provided that broker-dealers may receive Asset-Based Compensation from brokerage accounts without the

need to comply with the Advisers Act, so long as certain criteria are satisfied, including a requirement that the customer is given a written disclosure explaining that the account is a brokerage account and not an advisory account.

33.     In *Financial Planning Association v. SEC*, the D.C. Circuit vacated SEC Rule 202(a)(11)-1, holding that the SEC lacked any jurisdictional basis to promulgate the rule, given that the rule directly conflicts with the existing statutory Broker-Dealer Exclusion prohibiting Asset-Based Compensation in connection with brokerage accounts.  Accordingly, as a result of the decision, which by its terms became effective as of October 1, 2007, broker-dealers may not lawfully receive Asset-Based Compensation with respect to securities held in brokerage accounts.

34.     Therefore, mutual funds (like those in the Corporation) must, prior to making or allowing any payments of Asset-Based Compensation to broker-dealer firms in connection with customer accounts, ensure that the compensation is being paid only with respect to "advisory accounts," in order to maintain compliance with the Advisers Act.  If the account is an "advisory account," then the broker-dealer firm may lawfully receive Asset-Based Compensation.  If the account is a "brokerage account," then receipt of Asset-Based Compensation is unlawful, unless the parties can identify some other applicable statutory exclusion to the Advisers Act.

35.     Mutual funds organized as corporations, such as the Corporation, are governed by a Board of Directors.  As stated in Section 36(a) of the ICA, and under governing state law, mutual fund directors have a fiduciary duty of care to the Corporation -- the highest standard of care known in the law.  By reason of their positions as directors, the Director Defendants owed the Corporation and its shareholders fiduciary obligations of trust, loyalty, good faith and due

care, and were and are required to use their utmost ability to control and manage the Corporation in a fair, just, honest and equitable manner.

36.     Additionally, as reflected by the ICA and Rule 38a-1 adopted thereunder, mutual fund directors must oversee service providers to the mutual fund to ensure that these parties (typically affiliated with the fund's sponsor or promoter) are both complying with the law and acting in the shareholders' best interests, rather than the pecuniary interests of the sponsor.[1]

37.     Rule 38a-1 was adopted following a series of scandals that rocked the mutual fund industry in 2003, in which service providers to some mutual funds were discovered to be making improper and illegal arrangements abusive to fund investors, due to inadequate or ineffective oversight by fund directors/trustees. *See, e.g.,* "Special Report: Breach of Trust," BusinessWeek (Dec. 15, 2003) (available at www.businessweek.com ).[2]

---

[1] As explained by the Investment Company Institute ("ICI"), the mutual fund industry's Washington D.C.-based lobbying organization: "Unlike the directors of other corporations, mutual fund directors are responsible for protecting consumers, in this case, the fund's investors. This unique 'watchdog' role, which does not exist in any other type of company in America, provides investors with the confidence of knowing that directors oversee the advisers who manage and service their investments.  In particular, under the Investment Company Act of 1940, the board of directors of a mutual fund is charged with looking after how the fund operates and overseeing matters where the interests of the fund and its shareholders differ from the interests of its investment adviser or management company." *See* Brochure titled "Understanding the Role of Mutual Fund Directors" (1999) available at www.ici.org.

The ICI also stated in its 1999 brochure: "Because mutual fund directors are, in essence, looking out for shareholders' money, the law holds directors to a very high standard of behavior in carrying out their responsibilities.  They must act with the same degree of care and skill that a reasonably prudent person would use in the same situation or in connection with his or her own money.  Lawyers call this being a 'fiduciary' or having a 'fiduciary duty.'" *Id.*

[2] *See also* "The Mutual Fund Scandal: Unfair Fight," Newsweek (Dec. 8, 2003) (www.newsweek.com/id/60819 ); Alan R. Palmiter, "The Mutual Fund Board: A Failed Experiment In Regulatory Outsourcing," 1 Brook. J. Corp. Fin. & Com. L. 165 (Fall 2006); Patrick E. McCabe, "The Economics Of The Mutual Fund Trading Scandal," Board of Governors of the Federal Reserve System staff working paper # 2009-06 (available at www.federalreserve.gov ).

38.     In reaction to these scandals, on December 24, 2003, the SEC adopted new Rule 38a-1 under the ICA. *See* 17 C.F.R. § 270.38a-1.   Rule 38a-1 mandates certain practices designed to strengthen the ability of mutual fund boards to effectively exercise their duty to prevent, detect and correct violations of the federal securities laws by service providers.

39.     In particular, Rule 38a-1 requires the board of a mutual fund to approve the written compliance policies and procedures in place at each service provider, including the distributor, that are reasonably designed to prevent, detect and correct violations of the federal securities laws, including the ICA and the Advisers Act, by that service provider.

40.     Rule 38a-1 also requires the board to elect a Chief Compliance Officer ("CCO"). The CCO is required to provide an annual written report to the board that addresses the operation of the compliance policies and procedures of the mutual fund and each of its service providers. The report must also address any "material compliance matter," which is defined to include a violation of the federal securities laws by the service provider "or agents thereof." *See* 17 C.F.R. § 270.38a-1(e)(2)(i).

41.     In addition, the CCO is required to meet in executive session with the independent directors at least once each year, without the presence of anyone else (such as fund management or interested directors), other than independent counsel to the independent directors.  This allows the CCO and independent directors to speak freely about any sensitive compliance issues of concern to any of them, including any reservations about the cooperativeness or compliance practices of fund management or service providers.

42.     The following deadlines were established in connection with the implementation of initial Rule 38a-1:  board approval of the compliance policies and procedures of the mutual fund and each of its service providers was required by October 5, 2004; the first annual review of

the adequacy and effectiveness of the funds' and service providers' policies and procedures was due by April 5, 2006; and the first annual report by the CCO to the board to address the results of the annual compliance review was required by June 4, 2006.

43.    Accordingly, the Director Defendants have ultimate responsibility for service providers' compliance with the federal securities laws, including compliance with the requirements of the Advisers Act, as applicable, in connection with the distribution of Corporation shares.    The Director Defendants were required to review and approve the compliance policies and procedures in place at Distributor.    The Director Defendants were required to hold formal annual board reviews, since at least June 4, 2006, in which the Directors were supposed to evaluate the adequacy and effectiveness of Distributor's compliance procedures.

44.    The Corporation's CCO reports directly to the Corporation's Board of Directors. The CCO is required to make annual compliance reports to the Board of Directors, including reports of any material compliance issues facing Defendant Distributor and the retail broker-dealers that act as sub-agents for Distributor, including, specifically, any issues concerning compliance with the Advisers Act.    The CCO is also required to meet at least annually in executive sessions with the independent Directors to discuss material compliance issues.

45.    The Directors have failed to perform their duty to enforce compliance with the Advisers Act.    The Corporation and its service providers are paying Asset-Based Compensation to broker-dealers in connection with Corporation shares held by customers in brokerage accounts.    The Corporation, as distributor of its own shares, directly makes "Rule 12b-1 payments" out of Corporation assets to Distributor, a broker-dealer that sub-appoints other broker-dealer firms to distribute Corporation shares on an agency basis on behalf of the

Corporation.[3]  Pursuant to distribution plans approved by a majority of the independent Directors under SEC Rule 12b-1, 17 C.F.R. § 270.12b-1, these ongoing payments are calculated based on daily net asset values of shares held in customer accounts.[4]  In addition, Distributor or its affiliates make additional ongoing payments to broker-dealers based on daily net asset values of shares held in customer accounts, referred to as "non-Plan payments," "finder's" fees, "listing" fees, "distribution and marketing support" fees, and/or "revenue sharing" payments.  The ongoing payments continue despite the fact that Distributor and the broker-dealers that maintain the accounts cannot lawfully receive Asset-Based Compensation on account of Corporation shares held in brokerage accounts.

46.    These unlawful payments of Asset-Based Compensation to broker-dealers in connection with brokerage accounts improperly deplete the assets of the Corporation, and deprive Corporation shareholders of the protections and benefits of the advisory accounts to which they are entitled under applicable law.

## SUBSTANTIVE ALLEGATIONS

**Advisers Act's Application To Broker-Dealers**

47.    Broker-dealer firms are regulated by the Securities Exchange Act of 1934, which defines a "broker" as "any person engaged in the business of effecting transactions in securities for the account of others" and a "dealer" as "any person engaged in the business of buying and selling securities for such person's own account through a broker or otherwise."  15 U.S.C. §

---

[3] For example, in the fiscal year ending October 31, 2008, the Corporation funded payment of approximately $20.7 million in Asset-Based Compensation to broker-dealers pursuant to a Rule 12b-1 distribution plan for Class C shares.

[4] Rule 12b-1 also requires the Directors to review "at least quarterly, a written report of the amounts so expended and the purposes for which such expenditures were made," thus providing the Board with numerous additional opportunities to ascertain that Asset-Based Compensation was improperly being paid in connection with brokerage accounts.

78c(a)(4)(A), (5)(A). Firms that are brokers are commonly referred to as "brokerage firms" or "broker-dealers" and accounts that they maintain for their customers are commonly referred to as "brokerage accounts."

48.     In 1940, Congress established a different regulatory regime for persons who provide investment advice for compensation by enacting the Advisers Act, which defines an "investment adviser" as "any person who, for compensation, engages in the business of advising others. . . as to the value of securities or as to the advisability of investing in, purchasing, or selling securities. . . ." 15 U.S.C. § 80b-2(11). Client accounts that are subject to the Advisers Act are commonly referred to as "advisory accounts."

49.     Full-service broker-dealers fall within the definition of investment adviser, because (i) the package of services provided by broker-dealers includes advice; and (ii) broker-dealers receive compensation for the package of services they provide.

50.     A person comes within the definition of "investment adviser" in the Advisers Act even if compensation is paid to him or her by a third-party rather than his or her client. The compensation element of the "investment adviser" definition is "satisfied by the receipt of any economic benefit, whether in the form of an advisory fee or some other fee relating to the total services rendered, commissions, or a combination of the foregoing. Moreover, it is not necessary that the adviser's compensation be paid directly by the person receiving the investment advisory services; the adviser need only receive compensation from some source for his services." *College Resource Network*, 1993 SEC No-Act. LEXIS 630 (Apr. 9, 1993) (citations omitted).

51.     In enacting the Advisers Act, Congress recognized that broker-dealers fall within the definition of "investment adviser." However, Congress did not intend to displace the broker-dealer salesperson business model, and therefore included the  Broker-Dealer Exclusion the

statute as an exception from the definition of "investment adviser" for a broker or dealer that provides advice "solely incidental to the conduct of his business as a broker or dealer and who receives no special compensation therefor." 15 U.S.C. § 80b-2(11)(C).

52.    Although the terms "solely incidental" and "special compensation" in the Broker-Dealer Exclusion are not defined in the Advisers Act, it was understood from the inception of the legislation that broker-dealers can avoid Advisers Act requirements only "insofar as their advice is merely incidental to brokerage transactions for which they receive only brokerage commissions." S. Rep. No. 76-1775, 76th Cong., 3d Sess. 22 (1940).

53.    Broker-dealers typically seek to avoid Adviser Act regulation because the standard of care required of investment advisers is higher than the standard for broker-dealers. A 204-page SEC-sponsored report, published on January 8, 2008, authored by the RAND Corporation, titled "Investor and Industry Perspectives on Investment Advisers and Broker-Dealers," (available at www.sec.gov/news/press/2008/2008-1.htm ) ("RAND Report"), contains an extensive comparison of the legal duties owed by broker-dealers versus investment advisers.[5] The RAND Report observes that "unlike broker-dealers, federally registered investment advisers owe fiduciary obligations to their clients as a *categorical* matter. . . such obligations require the adviser to act solely with the client's investment goals and interests in mind, free from any direct or indirect conflicts of interest that would tempt the adviser to make recommendations that would also benefit him or her. . . . The fiduciary duties imposed on investment advisers require any adviser either to refrain from acting with a conflict of interest or to fully disclose the conflict and receive specific consent from the client to so act. Examples of such conflicts include various

---

[5] The RAND Report notes that its discussion of the differences in regulation between broker-dealers and investment advisers "is by no means a complete exegesis of the copious regulatory distinctions within these fields, which would require volumes." Rand Report at 7 n. 1.

practices in which an adviser may have pecuniary interest[.]" RAND Report at 13 (emphasis in original).

54.     In the 1990's, many broker-dealer firms sought to shift from traditional brokerage commissions to Asset-Based Compensation, without incurring Advisers Act regulation.   The movement was further legitimized after a group of securities industry representatives (known as the "Tully Committee," because it was chaired by Daniel Tully of Merrill Lynch) issued a report to the SEC in April 1995 that recommended asset-based compensation as a broker-dealer "best practice" that reduces churning and unsuitable securities recommendations motivated by transactional commissions. *See* Report of the Committee on Compensation Practices (April 10, 1995), available at www.sec.gov/news/studies/bkrcomp.txt .

55.     In support of asset-based compensation, the Tully Committee cited the overall desirability of compensating the relationship between a broker and his or her customer for trusted advice, rather than compensating for sales transactions. *See id*. at 4 ("The most important role of the registered representative is, after all, to provide investment counsel to individual clients, not to generate transaction revenues.   The prevailing commission-based compensation system inevitably leads to conflicts of interest among the parties involved.").

56.     Mutual fund companies innovatively met the broker-dealer industry's new demand for asset-based compensation by introducing new share classes of their mutual funds, such as "C-shares." With these new share classes, transactional sales loads, which are shareholder charges that are remitted to broker-dealers, are reduced or eliminated, in favor of Asset-Based Compensation for broker-dealers that is funded by ongoing 12b-1 fees and/or other fees imbedded in the mutual fund's internal expense structure (rather than a visible shareholder charge).

57. The SEC, including then Chairman Arthur Levitt, endorsed the Tully Committee recommendations, and sought to resolve the legal barrier to asset-based compensation for broker-dealers. SEC staff had concluded that the Broker-Dealer Exclusion, with its bright-line focus on the form of compensation, was "outdated," and viewed asset-based compensation as merely a "repricing" of the same package of brokerage services provided to customers paying transactional commissions, for which the Advisers Act requirements were avoided.

58. In speeches and other public communications, SEC staff disagreed with those who were arguing, on policy grounds, that the existing Broker-Dealer Exclusion focuses on the form of compensation for good reasons. Asset-based compensation creates an ongoing relationship between the broker-dealer and the customer. This, in turn, fosters an expectation by the client that his or her adviser has ongoing duties to him or her for as long as the compensated relationship is maintained. By contrast, broker-dealer firms receiving transactional commissions have legal duties under federal law to their customers that are limited to their role in the purchase or sale of securities. Therefore, the Broker-Dealer Exclusion appropriately reflects that only broker-dealers receiving transactional compensation are intended to be excluded from the requirements of the Advisers Act. SEC staff agreed that the Broker-Dealer Exclusion prohibited asset-based compensation, but did not find any of the policy arguments against expanding the Broker-Dealer Exclusion to be persuasive.

59. Relying on the SEC Designates Exclusion to the Advisers Act, *see* 15 U.S.C. § 80b-2(11)(G), the SEC cleared the way for Asset-Based Compensation for broker-dealers with a new rule allowing broker-dealers to receive "special compensation" in connection with brokerage accounts, so long as their investment advice is "solely incidental to the brokerage services provided to those accounts" and account agreements include a "prominent statement that

the accounts are brokerage accounts." *See* Notice of Proposed Rule, Certain Broker-Dealers Deemed Not To Be Investment Advisers, 64 Fed. Reg. 61,226 (Nov. 4, 1999) (the "1999 NOPR") (proposing new SEC Rule 202(a)(11)-1).

60.     In the 1999 NOPR, the SEC acknowledged that the Advisers Act prohibits broker-dealers from receiving asset-based compensation.  As its statutory authority for the new rule, the SEC cited the SEC Designates Exclusion, which states that the SEC may except "such other persons within the intent of this paragraph as the Commission may designate by rules and regulations or order" from the definition of investment adviser.  15 U.S.C. § 80b-2(11)(G).

61.     The release included an interim "no action" position by SEC staff allowing broker-dealers to receive "special compensation" while the proposed rule was being considered: "Until the Commission takes final action on the proposed rule, the Division of Investment Management will not recommend, based on the form of compensation received, that the Commission take any action against a broker-dealer for failure to treat any account over which the broker-dealer does not exercise investment discretion as subject to the [Advisers] Act."

62.     The proposed rule published in the 1999 NOPR was never submitted for a final vote at the SEC.

63.     In 2004, the Financial Planning Association ("FPA"), a group whose members are registered investment advisers, sued the SEC in the United States Court of Appeals for the District of Columbia.   The FPA asserted that the SEC had violated the Administrative Procedures Act for failing to either publish a final rule or withdraw the "temporary" no action position.   The FPA was interested in forcing the SEC to issue a final rule that could be challenged in court.  FPA members complied with the Advisers Act but had to compete in the

marketplace against broker-dealers providing similar services through brokerage accounts not subject to the Advisers Act, which the FPA perceived as unfair competition.

64.    Thereafter, the SEC re-published the proposed rule for fresh public comment, issued a formal temporary regulation and, subsequently, promulgated a final rule. *See* 70 Fed. Reg. 20424 (Apr. 19, 2005).

65.    In the final rule, the SEC expanded the disclosure required for any brokerage account in which "special compensation" is received.  The SEC mandated disclosure read as follows: "Your account is a brokerage account and not an advisory account. Our interests may not always be the same as yours. Please ask us questions to make sure you understand your rights and our obligations to you, including the extent of our obligations to disclose conflicts of interest and to act in your best interest. We are paid both by you and, sometimes, by people who compensate us based on what you buy. Therefore, our profits, and our salespersons' compensation, may vary by product and over time." The customer statement is also required to identify "an appropriate person at the firm with whom the customer can discuss the differences" between advisory and brokerage accounts. *See* 17 C.F.R. § 275.202(a)(11)-1.

66.    The revised disclosure requirement applied to brokerage accounts opened on or after July 22, 2005 for which broker-dealers were relying on the new rule to receive "special compensation." *See* 70 Fed. Reg. 20424, 20441 (Apr. 19, 2005).

67.    Relying on Section 213 of the Advisers Act, which allows a "party aggrieved" by an SEC order to obtain a federal Court of Appeals review, the FPA subsequently challenged the SEC's authority to promulgate Rule 202(a)(11)-1 by petition to the D.C. Circuit Court of Appeals.

68.     Because the Broker-Dealer Exclusion plainly prohibits broker-dealers from receiving "special compensation," the Court considered the SEC's argument that broker-dealers that receive "special compensation" are "other persons within the intent" of Congress to exclude, and, as such, could be excluded from the Advisers Act by virtue of SEC rulemaking under the SEC Designates Exclusion.  15 U.S.C. § 80b-2(11)(G).  The majority of the D.C. Circuit Court of Appeals panel rejected the SEC's argument, finding that broker-dealers cannot be "other persons" that the SEC could except by regulation, nor could broker-dealers receiving "special compensation" be a group of persons that were within the intent of the Advisers Act to except, since the Broker-Dealer Exclusion plainly states that broker-dealers cannot receive "special compensation."  *See Financial Planning Association v. SEC*, 482 F.3d 481, 488-89 (D.C. Cir. 2007).

69.     The dissenting opinion agreed with the majority that asset-based compensation is "special compensation."  *Id.* at 494.  The dissent also agreed with the majority that "a broker-dealer who receives any kind of compensation other than commission does not come within the [Broker-Dealer Exclusion], even if he, too, provides advice solely as an incident to his business as a broker-dealer."  *Id.*  However, unlike the majority, the dissenting judge would have allowed the SEC to proceed under the SEC Designates Exclusion to authorize "special compensation," based on the judge's view that the "other persons" language in the SEC Designates Exclusion is ambiguous, and that the SEC had made a reasonable interpretation of its rulemaking authority to classify broker-dealers that receive "special compensation" as "other persons."  *Id.*

70.     Therefore, the *Financial Planning Association* decision reflects that the SEC, the D.C. Circuit Court of Appeals majority, and the dissenting judge, were all in agreement that asset-based compensation is "special compensation" and that broker-dealers are prohibited by

the Advisers Act from receiving such compensation, unless SEC Rule 202(a)(11)-1 was a valid exercise of SEC rulemaking authority.

71.     Accordingly, the *Financial Planning Association* decision, striking SEC Rule 202(a)(11)-1 in its entirety as invalid, confirms that broker-dealers may not lawfully receive asset-based compensation in connection with brokerage accounts in the United States.

72.     The SEC decided not to appeal the ruling vacating SEC Rule 202(a)(11)-1, and requested a stay of mandate to give regulated parties time to transition brokerage accounts receiving special compensation to either advisory accounts or to brokerage accounts receiving transaction commissions. The D.C. Circuit Court of Appeals subsequently stayed its mandate until October 1, 2007. *See* 2007 U.S. App. LEXIS 15169 (D.C. Cir. June 25, 2007).

73.     Pursuant to Section 38(c) of the ICA, and Section 211(d) of the Advisers Act, regulated parties are not liable for good faith reliance on SEC rules, regulations or orders prior to the time that such rule, regulation or order is "determined by judicial or other authority to be invalid for any reason."

74.     Accordingly, prior to October 1, 2007, broker-dealers may lawfully have received Asset-Based Compensation only in connection with brokerage accounts for which they can demonstrate compliance with former SEC Rule 202(a)(11)-1, including compliance with the disclosure requirement of the now vacated rule. *See* SEC Rule 202(a)(11)-1(a)(1)(ii).

75.     As of October 1, 2007, broker-dealers may no longer lawfully receive Asset-Based Compensation in connection with brokerage accounts.

76.     On September 28, 2007, the SEC published for comment a proposed interpretative rule under the Advisers Act that reinstates certain portions of the original rule vacated by the *Financial Planning Association* decision.  One reinstated provision is that a

"broker or dealer registered with the Commission under Section 15 of the Exchange Act is an investment adviser solely with respect to those accounts for which it provides services or receives compensation that subject the broker-dealer to the Advisers Act." *See* Proposed SEC Rule 202(a)(11)-1(c), "Interpretive Rule Under the Advisers Act Affecting Broker-Dealers," 72 Fed. Reg. 55126 (Sept. 28, 2007). The SEC states in its release that this interpretive guidance was not previously challenged in the Court proceeding, and was being re-promulgated to permit a firm that is a dual registrant, *i.e.* registered both as a broker-dealer and an investment advisory firm, "to distinguish its brokerage customers from its advisory clients." No final rule has been issued.

**Defendants' Duty To Enforce The Advisers Act**

77.     As discussed above, the ICA and SEC Rule 38a-1 provide that the Director Defendants have ultimate responsibility for ensuring that payments by the Corporation and its service providers are in compliance with the federal securities laws, including the Advisers Act. The Director Defendants failed to perform this duty.

78.     Specifically, in the period from July 22, 2005 to September 30, 2007, the Director Defendants failed to ascertain whether FAMD and BDI had compliance policies and procedures in place to ensure that broker-dealers receiving Asset-Based Compensation payments in connection with Corporation shares held in brokerage accounts that were opened in that period were in compliance with the conditions set forth in former SEC Rule 202(a)(11)-1 for receipt of such compensation. In the period from October 1, 2007 to present, the Director Defendants failed to ascertain whether Distributor, FAMD and BDI had compliance policies and procedures in place to ensure that Asset-Based Compensation is paid only to registered investment advisers, or broker-dealers that are dual registrants, and that Corporation shares upon which such compensation is paid are held in advisory accounts governed by the Advisers Act.

79.     As a result of the Director Defendants' breaches of their fiduciary duties, the Corporation and its service providers made and continue to make unlawful payments of Asset-Based Compensation to broker-dealers in connection with Corporation shares held in brokerage accounts.  These unlawful payments constitute a *per se* waste of Corporation assets, causing harm to the Corporation and its shareholders.  In addition, the Director Defendants' failure to enforce the Advisers Act has caused, and continues to cause, shareholders to be deprived of the investor protections and benefits of advisory accounts to which they are entitled to as a matter of law.

## ADDITIONAL DERIVATIVE AND DEMAND REQUIREMENT ALLEGATIONS

80.     In addition to the allegations set forth above, as described below, plaintiff brings this action derivatively in the right and for the benefit of the Corporation to redress injuries suffered and to be suffered by the Corporation as a direct result of the violations of law by Defendant Distributor and the Director Defendants, for which demand on the Corporation's Board of Directors was made.  The Corporation is named as a nominal defendant solely in a derivative capacity.

81.     Plaintiff will adequately and fairly represent the interests of the Corporation and its shareholders in enforcing and prosecuting their rights.

82.     Through his attorneys, plaintiff made demand on the Corporation's Board of Directors.  By letter dated February 6, 2009, plaintiff demanded that the Board cause the Corporation and its service providers to cease funding and paying Asset-Based Compensation to broker-dealers in connection with Corporation shares held in brokerage accounts in the United States, to restore to the Corporation certain of such payments made in the past, and to remedy the Directors' breaches of their fiduciary duties of loyalty and due care, and their waste of Corporation assets.  *See* Exhibit 1.

83.     By letter dated May 26, 2009, counsel for the Board for the Corporation reported that the Board had considered a report and recommendation prepared by a Demand Review Committee of three independent directors and concluded that plaintiff's demand "should be rejected as not supported by the facts or the law and not in the best interests of Fund shareholders." *See* Exhibit 2.  The letter argues that the Asset-Based Compensation at issue is "in the nature of transaction-based versions of sales commissions permitted to be paid [to broker-dealers]."   Therefore, as "transaction-based forms of sales commissions," the Asset-Based Compensation at issue fall within the scope of the Broker-Dealer Exclusion to the Advisers Act, according to the letter.

84.     The response to the demand is a wrongful refusal to act, for the reasons stated in this complaint, and does not give any business judgment reasons for the Board of Directors' failure to act.  In any event, the federal policies underlying the claims asserted herein preempt any state law grounds for terminating this litigation.   Accordingly, the prosecution of these claims on a shareholder derivative basis is appropriate.

### FIRST CAUSE OF ACTION

### Violation Of Section 47(b) Of The ICA Against Defendants Distributor, FAMD and BDI

85.     Plaintiff incorporates by reference each of the foregoing allegations as if fully stated herein.

86.     Section 47(b) of the ICA provides that a contract made in violation of the ICA, or whose performance involves a violation of the ICA, or any rule thereunder, is unenforceable by either party, and provides for whole or partial rescission and restitution.  The Corporation is entitled to void the broker-dealer compensation provisions in its distribution agreements between the Corporation and Distributor, FAMD and BDI because these provisions were made in

violation of, and their performance involves violations of, the ICA insofar as these provisions authorize using Corporation assets for illegal payments, and violate the mandate of the ICA and SEC Rule 38a-1 that the Corporation and its service providers, and agents of service providers, comply with all applicable federal securities laws, including the Advisers Act.

87.     Past unlawful payments to Distributor, FAMD and BDI and their sub-agents pursuant to the distribution agreements constitute unjust enrichment to be restituted to the Corporation by Distributor, FAMD and BDI, as follows: for the period July 22, 2005 to September 30, 2007, the amount of the past payments of Asset-Based Compensation to FAMD and BDI and/or their sub-agents in connection with Corporation shares held in brokerage accounts in which the requirements of former SEC Rule 202(a)(11)-1 were not satisfied, and from the period of October 1, 2007 to present, the amount of Asset-Based Compensation in connection with Corporation shares held in brokerage accounts paid to Distributor, FAMD and BDI and/or their sub-agents.

## SECOND CAUSE OF ACTION

### Breach of Contract Against Defendants Distributor, FAMD and BDI

88.     Plaintiff incorporates by reference each of the foregoing allegations as if fully stated herein.

89.     In the operative written distribution agreements between the Corporation and Distributor, FAMD and BDI, the broker-dealer distributors, on behalf of themselves and their sub-agent broker-dealers, warranted that they would comply with the federal securities laws.

90.     In material breach of their contractual promise, Distributor, FAMD and BDI have received and Distributor continues to receive Asset-Based Compensation from Corporation

assets in connection with Corporation shares held in brokerage accounts, which is prohibited by the Advisers Act.

91.     As a result of the breach by Distributor, FAMD and BDI, there has been a *per se* waste of Corporation assets, causing harm to the Corporation and its shareholders.  In addition, the breach of contract caused Corporation shareholders to be deprived of advisory accounts subject to the investor protections and benefits of the Advisers Act.  The Corporation's damages equal, for the period from July 22, 2005 to September 30, 2007, the amount of the payments during the period of Asset-Based Compensation to FAMD and BDI and/or their sub-agents in connection with Corporation shares held in brokerage accounts in which the requirements of former SEC Rule 202(a)(11)-1 were not satisfied, and from the period from October 1, 2007 to present, the amount of Asset-Based Compensation in connection with Corporation shares held in brokerage accounts paid during the period to Distributor, FAMD and BDI and/or their sub-agents.

## THIRD CAUSE OF ACTION

### Breach of Fiduciary Duty Against The Director Defendants

92.     Plaintiff incorporates by reference each of the foregoing allegations as if fully stated herein.

93.     The Director Defendants are fiduciaries of the Corporation and of all of its shareholders and owe them the duty to conduct the affairs of the Corporation loyally, faithfully, carefully, diligently and prudently.  This cause of action is asserted based upon the Director Defendants' acts in violation of state law, which acts constitute breach of fiduciary duty.

94.     Each of the Director Defendants participated in the acts of mismanagement alleged herein, or acted in reckless disregard of the facts and law known to them, and failed to

exercise due care to prevent the misuse of Corporation assets. The Director Defendants became aware, or should have become aware through reasonable inquiry, of the facts alleged herein including, among others, the deficiencies in the compliance policies and procedures of the Corporation and its service providers permitting unlawful payments of Asset-Based Compensation to broker-dealers in connection with Corporation shares held in brokerage accounts. The Director Defendants thereby breached their duty of care and loyalty to the shareholders of the Corporation by failing to act as ordinary prudent persons would have acted in a like position.

95.     Each of the Director Defendants also engaged in an intentional dereliction of duty and demonstrated a conscious disregard for his or her responsibilities. The Board of Directors had an affirmative duty to investigate the legality of the broker-dealer compensation payments, including through mandated quarterly reviews of 12b-1 fee payments, and the annual compliance reviews of service providers, mandated by SEC rules, including determining whether Corporation shares were held in brokerage accounts. The Director Defendants thereby acted in bad faith to the shareholders of the Corporation by failing to act as ordinary prudent person would have acted in a like position.

96.     As a result of the foregoing, the Corporation has suffered considerable damage to and material diminution in the value of its assets paid as illegal compensation to Distributor, FAMD and BDI and their sub-agents.

97.     Each of the Director Defendants, singly and in concert, engaged in the aforesaid conduct in reckless disregard and/or intentional breach of his or her fiduciary duties to the Corporation.

## FOURTH CAUSE OF ACTION

### Waste of Corporation Assets Against The Director Defendants

99.     Plaintiff incorporates by reference each of the foregoing allegations as if fully stated herein.

100.    As a result of the unlawful Asset-Based Compensation paid from Corporation assets to Distributor, FAMD and BDI and their sub-agents, and by failing to properly consider the interests of the Corporation and its shareholders by failing to conduct proper supervision, the Director Defendants have caused a *per se* waste of valuable Corporation assets through illegal payments from Corporation assets.

101.    As a result of the waste of Corporation assets, the Director Defendants are liable to the Corporation.

102.    The Corporation has no adequate remedy at law.

### PRAYER FOR RELIEF

WHEREFORE, plaintiff demands judgment on behalf of the Corporation as follows:

(a)     Determining that this action is a proper derivative action maintainable under law, that the demand requirement was satisfied, and that demand was wrongfully refused;

(b)     Against each Defendant for restitution and/or damages in favor of the Corporation and its shareholders;

(c)     Declaratory and injunctive relief as permitted by law, including attaching, impounding, imposing a constructive trust on, or otherwise restricting, the Asset-Based Compensation previously paid to Distributor, FAMD and BDI and enjoining the Corporation and Distributor from any further payments of Asset-Based Compensation to broker-dealers in connection with Corporation shares held in brokerage accounts in the United States;

(d)     Awarding pre-judgment interest on all monetary damages;

(e)    Awarding plaintiff the costs and disbursements of this action, including reasonable attorneys', accountants', and experts' fees; and

(f)    Granting such other and further relief as this Court may deem just and proper.

### JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

DATED:      December 30, 2009

MILBERG LLP

Michael C. Spencer

mspencer@milberg.com
Janine L. Pollack
jpollack@milberg.com
One Pennsylvania Plaza
New York NY  10119
Telephone:  (212) 594-5300
Facsimile:  (212) 868-1229

Lee A. Weiss
lweiss@bwgfirm.com
**BROWNE WOODS GEORGE LLP**
49 West 37th Street, 15th Floor
New York, NY  10018
Telephone:  (212) 354-4901
Facsimile:  (212) 354-4904

Ronald A. Uitz
ron877@yahoo.com
**UITZ & ASSOCIATES**
1629 K Street, N.W. Suite 300
Washington, D.C.  20006
Telephone:  (202) 296-5280
Facsimile:  (202) 521-0619

Alfred G. Yates, Jr. Esq.
yateslaw@aol.com
**LAW OFFICE OF ALFRED G. YATES, JR. P.C.**
519 Allegheny Building
429 Forbes Avenue
Pittsburgh, Pennsylvania 15219

**LAW OFFICE OF ALFRED G. YATES, JR. P.C.**
519 Allegheny Building
429 Forbes Avenue
Pittsburgh, Pennsylvania 15219
Telephone:  (412) 391-5164
Facsimile:  (412) 471-1033

*Attorneys for Plaintiff*

**VERIFICATION**

I, Bradley C. Smith, under penalties of perjury, state that I have read the foregoing

Verified Derivative Complaint and authorize its filing, and that the foregoing is true and correct

to the best of my knowledge, information, and belief.

Dated:  December 24, 2009

Bradley C. Smith

**Exhibit 1**

# MILBERG LLP

NEW YORK
LOS ANGELES
TAMPA
DETROIT

Michael C. Spencer
Direct Dial: 212-946-9450
mspencer@milberg.com

February 6, 2009

Board of Directors
BlackRock Large Cap Series Funds, Inc.
40 East 52nd Street
New York, NY 10022

      Re:    Shareholder Demand For Cessation
               <u>and Restoration of Certain Payments to Broker-Dealers</u>

Dear Members of the Board of Directors:

This letter is a shareholder demand that the Board of Directors of BlackRock Large Cap Series Funds, Inc. ("the Corporation") immediately (a) cause the Corporation to cease funding and permitting the payment of ongoing non-transactional asset-based compensation ("Asset-Based Compensation") to broker-dealers in connection with Corporation shares held in brokerage accounts in the United States, and (b) take all necessary and reasonable steps to restore to the Corporation all payments of such Asset-Based Compensation in the past.

This letter is submitted on behalf of Bradley C. Smith, who owns Class C shares of the BlackRock Large Cap Value Fund (MCLVX), which is one of three portfolios that comprise the Corporation. His shares are held in a brokerage account at Merrill Lynch.

The Corporation has elected to act as distributor of shares of which it is the issuer. Pursuant to written distribution plans adopted by the Board, the Corporation pays for distribution-related services from the Corporation's assets, including payments of Asset-Based Compensation to broker-dealers.

The Corporation appointed BlackRock Investments, Inc. ("BII") as the Corporation's exclusive agent for performing distribution-related services, either directly or through third parties, effective October 1, 2008. Prior to that date, FAM Distributors, Inc. ("FAMD") and BlackRock Distributors, Inc. ("BDI") were co-distributors. Distribution agreements between the Corporation and BI, FAMD and BDI authorize payments of Asset-Based Compensation to broker-dealers. These payments are set at an annual percentage rate of average daily net asset

**Milberg LLP**

One Pennsylvania Plaza · New York, NY 10119-0165 · (212) 594-5300 · Fax: (212) 868-1229 · www.milberg.com

February 6, 2009
Page 2

values of shares of the Corporation and disbursed monthly. For example, in the fiscal year ending October 31, 2008, the Corporation funded payment of approximately $20.7 million in Asset-Based Compensation to broker-dealers pursuant to a distribution plan for Class C shares. Additional Asset-Based Compensation payments to broker-dealers are described as "non-Plan payments" and "revenue sharing" payments.

Broker-dealers who receive compensation in connection with Corporation shares held in brokerage accounts (a) are subject to the Investment Advisers Act of 1940 ("IAA"), (b) do not comply with IAA requirements with respect to those accounts, and (c) are not exempt under IAA section 202(a)(11)(C) so long as they receive Asset-Based Compensation, as confirmed in *Financial Planning Association v. SEC*, 482 F.2d 481 (D.C. Cir. 2007).

Smith asserts that the Corporation's funding or permitting the payment of such compensation constitutes waste of Corporation assets, violates the Investment Company Act and other laws, caused injury to the Corporation, and reduced shareholders' investment returns. Present and former Directors acted with malfeasance and/or failed to properly exercise adequate oversight in approving such payments.

Smith demands that the Board of Directors:

1.     Cause the Corporation to cease funding or permitting payments of Asset-Based Compensation to broker-dealers in connection with shares of the Corporation held in brokerage accounts in the United States, and terminate or reform all distribution plans and distribution agreements by which the Corporation funds or permits such unlawful payments.

2.     Take all reasonable and necessary steps, including litigation, to restore to the Corporation all payments of Asset-Based Compensation to broker-dealers in connection with shares of the Corporation held in brokerage accounts in the United States, including but not limited to obtaining recovery from present and former Directors of the Corporation and/or BII, FAMD, and BDI.

We respectfully request a response to this demand within 60 days. If a satisfactory response is not received, we intend to commence a derivative action on behalf of the Corporation.

Sincerely,

Michael C. Spencer

Certified Mail
Return Receipt Requested

**Milberg LLP**

# Exhibit 2

DEBEVOISE & PLIMPTON LLP

919 Third Avenue
New York, NY 10022
Tel  212 909 6000
www.debevoise.com

John S. Kiernan
Partner
Tel  212 909 6692
Fax  212 521 7692
jskiernan@debevoise.com

May 26, 2009

Michael C. Spencer, Esq.
Milberg LLP
One Pennsylvania Plaza
New York, NY 10119

**February 6, 2009 Shareholder Demand**

Dear Mr. Spencer:

I am writing at the instruction of the Board of Directors for the BlackRock Large Cap Series Funds (the "Board" and the "Funds"), to respond to your letter of February 6, 2009 asserting concerns and making demands on behalf of an owner of Class C shares in the BlackRock Large Cap Value Fund.

As I described in my March 9, 2009 letter to you on behalf of the Board, the Board responded to your letter by appointing a Demand Review Committee (the "Committee") of three independent directors tasked with considering the contentions raised by your letter and presenting a recommendation to the full Board. The Committee has undertaken and completed a full review of the points raised in your letter and has presented a report and recommendation to the Board following that review. The Board considered the Committee's report and recommendation at its meeting held on May 22, 2009 and has instructed me to provide you with its conclusions.

As I explained in my March 9 letter to you, the Demand Review Committee views your letter as providing limited and unclear guidance as to what precise wrongs you contend have occurred, what authorities you believe support your position, what causes of action you believe should be asserted and what harm you assert Fund shareholders have suffered. In light of your election not to respond to the Board's invitation as relayed in my letter to provide more specific information on these topics, the Committee and the Board have considered your letter based on their best interpretation of its general thrust and its particulars.

In general, the Committee and the Board understand your letter to demand that the Board cause the Fund in which your client owns shares to take legal action to redress what you contend to be the illegality of current compensation arrangements between the

New York  •  Washington, D.C.  •  London  •  Paris  •  Frankfurt  •  Moscow  •  Hong Kong  •  Shanghai

Michael C. Spencer, Esq.                    2                        May 26, 2009

Fund and broker-dealers who serve as the Fund's primary distribution channel. The Committee and the Board understand your primary contention to be that the Funds are impermissibly paying distribution fees to broker-dealers not registered as investment advisors ("Single Registrants") under the Investment Advisers Act of 1940 (the "IAA"), in circumstances where the entities that receive these fees do not fall within the statutory exemption from the registration obligation for broker-dealers who provide only incidental investment advice and do not receive "special compensation." We understand your assertions to relate primarily to Fund payments in the form of a percentage of net asset value of shares distributed by a broker, which are a feature of Investor Distribution Agreements and Service Agreements entered as part of an approved Plan under Rule 12b-1 of the Investment Company Act of 1940, 15 U.S.C. § 270.12b-1 (the "Rule 12b-1 Plan"). Your letter appears to contend that these fees include compensation for incidental investment advice, and, in contrast to normal sales commissions, constitute "special compensation" requiring registration under the IAA by the broker-dealers that receive these fees. The Committee and the Board understand your letter also to question, on the same basis, "non-Plan" and "revenue sharing" payments to Single Registrant broker-dealers by BlackRock Advisors, LLC, the Funds' adviser ("BlackRock").

The Committee has conducted a full evaluation of these issues, including receipt and review of information and perspectives from a broad collection of sources, and has delivered its report and recommendations to the Board. The Board has in turn determined, following consideration of the Committee's report and recommendation, that your demand should be rejected as not supported by the facts or the law and not in the best interests of Fund shareholders.

At the outset, your letter's starting premise – that the broker-dealers that receive distribution fees from the Funds are only Single Registrants – is simply incorrect. Most or all of the broker-dealer recipients of Rule 12b-1 distribution fees from the Funds, significantly including the broker-dealer that by itself receives the substantial majority of such fees, are registered as both broker-dealers and investment advisers under the IAA ("Dual Registrants").

Even assuming that one or more of the many broker-dealers that receive distribution fees pursuant to a Rule 12b-1 Plan are only Single Registrants as your letter incorrectly assumes for all such broker-dealers, or even if some Fund shares distributed by Dual Registrants are sold through regular brokerage accounts rather than advisory accounts, those broker-dealers' receipt of such fees would not by itself require the broker-dealers to become Dual Registrants as your letter contends. As you know, the IAA provides in Section 202(a)(11)(c) for an exception to the registration requirement for broker-dealers that provide investment advisory services "solely incidental" to their business and "receive[] no special compensation therefor." 15 U.S.C. § 80b-2(a)(11)(c). The Board has concluded, following the Committee's recommendation, that the broker dealers that receive contribution fees under Rule 12b-1 Plans fall within this exception.

Michael C. Spencer, Esq.                    3                    May 26, 2009

Substantial SEC and FINRA authority supports the conclusion that such fees are not relationship-based "special compensation" outside the scope of Section 202(a)(11)(c), but are instead in the nature of transaction-based versions of sales commissions permitted to be paid to Single Registrant broker-dealers. The FINRA caps on total funds payable for distribution fees, the treatment of redemption fees as contingent deferred sales charges, and the treatment of these fees as alternative forms of sales charges to a front-end load in the relevant literature and in the Funds' publicly filed materials, among other considerations, reinforce the nature of these fees as transaction-based forms of sales commissions. Such fees, which are paid for performance of distribution functions by entities that receive no investment advice in return, also are properly viewed either as not compensation for any investment advice at all or at most as compensation only for advice that is "solely incidental" to the broker-dealer's conduct of its business within the scope of the statutory exception.

With respect to asset-based fees paid pursuant to Shareholder Servicing Agreements, no investment advice is being imparted to the Funds or to any customer in connection with those fees directed exclusively to account maintenance activities.

Your assertions with respect to "revenue-sharing" or other "non-Plan" payments that BlackRock may make to broker-dealers carry the further impediment that the entity making these payments is not a fund, a distribution agent or any entity subject to the Board's discretion but BlackRock, as adviser to the Funds. The Board ensures the separateness of these payments from the Funds and from Fund shareholders as part of its regular section 15(c) process of evaluating the adviser's compensation each year. These payments cannot trigger the obligation for the Board to enforce Dual Registration that your letter posits, not only because the Board has no control over or capacity to influence these payments made independently by BlackRock but also because the adviser that makes these payments neither seeks nor receives any investment advice in return.

Despite the absence of substantive merit to your letter's assertions, the Committee and the Board also considered whether it would be in the best interests of Fund shareholders to require any Single Registrant brokers that receive distribution fees to become Dual Registrants, or to require Dual Registrant broker-dealers to place Fund shares only with customers that have opened advisory accounts regardless of whether the customers and broker-dealers prefer not to open such accounts (which can involve greater cost to both customers and broker-dealers). The Board has concluded, following the Committee's recommendation, that imposing such requirements in the absence of a legal obligation to do so would not be in shareholders' best interests. The Board has reached the view that among other consequences, such a requirement could disrupt Fund distribution channels and interfere with the provision of shareholder services and account maintenance to existing shareholders. The Board also believes that broker-dealers are currently performing satisfactorily the work for which they are being compensated.

Michael C. Spencer, Esq.                    4                    May 26, 2009

  The Board has further concluded that undertaking the substantial cost to the Funds of pursuing the litigation your letter proposes would not be in the best interests of the Funds or their shareholders, given the absence of merit to the proposed claims, the uncertainty of any substantial recovery even if the claims had merit, and the substantial value of the services that the broker-dealers who would be the subject of such a suit have provided – and continue to provide – to the Funds and their shareholders in return for the payments they receive.

  For all these reasons, the Board has determined to reject the demands set forth in your letter.

        Sincerely yours,

        John S. Kiernan

22969521v3